[Civ. No. 10734. First Appellate District, Division Two.—March 3, 1938.]

THE ANGLO CALIFORNIA NATIONAL BANK OF SAN FRANCISCO, as Successor Trustee, Plaintiff and Respondent, v. HARRY I. STAFFORD, as Executor, etc., et al., Defendants and Respondents; HAROLD L. ZELLERBACH et al., Appellants.

Pillsbury, Madison & Sutro, Eugene D. Bennett and Frederick H. Hawkins for Appellants.

Daniel R. Shoemaker and Dean Cunha for Defendants and Respondents.

STURTEVANT, J.—From a judgment modifying certain trust agreements the remaindermen have appealed.

Arthur and Isadore Zellerbach were brothers. Harold L. and J. D. Zellerbach are the sons of Isadore and were nephews of Arthur. Dorothy Johnson Zellerbach is the first divorced wife of Arthur. Dorothy Ryan Zellerbach is the second divorced wife of Arthur. Philip S. Ehrlich is an attorney at law and was the trustee named in all of the trusts excepting the last one that will be mentioned. The Anglo California National Bank of San Francisco was substituted as trustee in the place of Philip S. Ehrlich. On January 20, 1923, Arthur, as trustor, entered into a trust with Harold L. and J. D. as the beneficiaries, which provided for the transfer of shares of stock of the Zellerbach Paper Company which Arthur was shortly to receive from his mother's estate. On July 28, 1923, Arthur, as trustor, and Harold L. entered into a similar agreement regarding certain additional shares of stock of the Zellerbach Paper Company. On June 21, 1927, a further agreement was entered into by Arthur, Isadore, Harold L. and J. D. Zellerbach, and Philip S. Ehrlich, under the terms of which Philip S. Ehrlich was substituted as trustee in the first two agreements. The agreement last mentioned also provided for the payment of $300 per month to Dorothy Johnson Zellerbach during the life of Arthur. Isadore, who held assignments from Arthur for all of the income of the trust to secure advancements theretofore made to Arthur, and other indebtedness, subordinated his rights to the monthly payments to be made to Dorothy Johnson Zellerbach. Arthur expressly acknowledged the financial aid theretofore rendered to him by his brother and he expressly

ratified and confirmed the trust agreements made in 1923. Except as modified, such agreements were to remain in full force and effect. The shares of stock comprising the *corpus* of said trust were by the corporate action and reorganization of the corporations converted into voting trust certificates representing 11,655 shares of common stock of Crown Zellerbach Corporation and 2,331 shares of preferred stock of such corporation. On July 22, 1930, a further written agreement was entered into by Arthur, as trustor, Dorothy Ryan Zellerbach, as beneficiary, and Philip S. Ehrlich, as trustee. By its terms $200 per month was made payable to the beneficiary. That agreement by its terms subordinated the claim of Isadore to the assignments theretofore made by Arthur. On October 5, 1935, a six party agreement was entered into by all of the parties above mentioned excepting this plaintiff and Dorothy Ryan Zellerbach. It provided for the resignation of Mr. Ehrlich and shortly after its execution he resigned as trustee and this plaintiff was substituted. Said document provided (1) for the sale of a portion of the *corpus* of the trust to pay certain creditors of Arthur and his two divorced wives in the total amount of $49,521.70; (2) for the release of all claims by Dorothy Ryan Zellerbach; (3) for the reduction of the monthly payments to Dorothy Johnson Zellerbach out of the income from the trust from $300 to $250 per month; (4) for the resignation of Philip S. Ehrlich as trustee and the substitution of a corporate trustee in his place and stead; (5) the income of the remainder of the trust property was to be disbursed by the trustee in priority as follows: (a) The payment of the annual premiums on a policy of life insurance on the life of Arthur Zellerbach. The beneficiary of this policy was respondent Dorothy Johnson Zellerbach. (b) The sum of $250 per month to Dorothy Johnson Zellerbach during her life. Such payments to terminate on the death of Arthur Zellerbach. (c) The sum of $250 per month to Arthur Zellerbach during his life. (d) Any excess over and above the amount required for the above-mentioned payments, to be paid to appellants and to I. Zellerbach in equal amounts and to such extent as necessary to discharge certain personal debts then due and owing to the three last-named persons by Arthur Zellerbach.

Upon the discharge of the aforementioned debts out of the income, as above mentioned, then all of the income after the payment of the premiums on the aforementioned insurance

policy and the monthly payment of $250 to Dorothy Johnson Zellerbach, was to go to Arthur Zellerbach during his life. Then followed a paragraph, the construction of which is the crux of this litigation. Bearing in mind that Harold L. Zellerbach was the third party, J. D. Zellerbach the fourth party, and I. Zellerbach was the fifth party, said paragraph is as follows:

"6. *In the event that the aforementioned indebtedness due and owing said third, fourth and fifth parties as hereinabove mentioned in paragraph 5 hereof is not fully paid and discharged within the period of two (2) years following the date hereof, then at the option of the third, fourth, and fifth parties* the trustee shall sell so much of any of the common stock or voting certificates representing the same which said trustee shall hold, and if that is not sufficient, then as many shares of preferred stock as may be necessary to pay off and discharge in full the balance of each said indebtedness. Said preferred stock, however, shall not be sold for such purpose for less than the sum of fifty dollars ($50) per share." (Italics ours.)

After the trial, but before briefs were filed on appeal, Arthur Zellerbach died. Thereafter such proceedings were had that Harry I. Stafford, as executor of decedent's last will and testament, was substituted and he appeared as respondent in the place of the decedent.

Conflicting claims having been made on the trustee, the latter commenced an action asking for declaratory relief. That complaint was answered and a complaint in intervention was filed by Harold L. and J. D. Zellerbach. That complaint was also answered and a trial was had on the issues presented by said pleadings. The trial court made findings of fact in favor of Arthur Zellerbach and later caused a judgment to be entered which in part is as follows: "Now, therefore, it is hereby ordered, adjudged, and decreed that the Anglo California National Bank of San Francisco, as successor trustee, sell a sufficient number of the voting trust certificates representing shares of the common stock of the Crown Zellerbach Corporation to fully pay and discharge the obligations owed by the defendant, Arthur Zellerbach, to J. D. Zellerbach, Isadore Zellerbach, and Harold L. Zellerbach, and that said sale be made upon the San Francisco Stock Exchange, or the New York Stock Exchange at the

present available market price as soon as possible.'' The interveners have appealed.

They contend that none of the findings support or justify the judgment below and that the findings upon which the judgment was predicated are not supported by the evidence. These attacks involve the proper construction of the provisions of the declarations of trust or, to be more specific, the construction of the agreement dated October 5, 1935. Arthur Zellerbach was called as a witness. He identified certain documents and gave some evidence as to his needs. Otherwise there was no evidence *aliunde* the written instruments as to the meaning of any portions thereof.

The first point presented by the interveners is that the death of Arthur Zellerbach ended the controversy and the action below became moot. In view of the conclusions we have reached on the other points made by the interveners it will not be necessary to discuss the first point.

■ The interveners contend the express provisions of the agreements between the parties show that the trustee, under the facts existing at the time of the trial, had no power to sell a part of the *corpus* to pay the debts in question. They quote in full paragraph 6 of the agreement dated October 5, 1935, and call particular attention to the language which we have set forth in italics. They then call to our attention that they never exercised the option mentioned in said paragraph and furthermore that the period of two years specified in said paragraph had not expired when this action was commenced March 11, 1936. They further call attention to the fact that they never applied to the trustee to make the sale but at all times have opposed the sale. Thereupon they contend there was no express power authorizing the trustee to make the sale. In that connection they assert the general rule is that a trustee ''has no authority beyond that expressly conferred''. (65 C. J. 645.) They further contend that the written instruments reveal the only implication possible is that the power for which Arthur Zellerbach and his representative contend is prohibited to the trustee. In that regard they call particular attention to the fact that under paragraph 1 the trustee was authorized to make sales to the extent of $49,521.70 to pay certain obligations of Arthur Zellerbach, including one in the sum of $30, but that authorization did not include power to sell for the purpose of paying the obligations owing to the

third, fourth and fifth parties to the agreement. On the other hand, that under paragraph 5 specific provisions were inserted providing for payments of the income, specified sums to specified persons, and then in the event an excess was on hand payments could be made to the third, fourth and fifth parties. Thereupon the defendants argue that such provisions were plainly an implication that the sale which was expressly authorized was not to cover obligations to the third, fourth and fifth parties but was an implication that no sale should be made to cover their obligations except as set forth in said paragraph 6. These respective contentions are clearly supported by the record. ■ The trustor replies the passages just enumerated may "negative a duty to sell before two years, but they certainly cannot negative a power to sell before that time". That reply is not supported by the language used by the parties. No authority is cited which requires this court to place the strained construction on the language of the parties for which the trustor contends. He cites *Guaranty Trust Co.* v. *United States Steel Corp.*, 107 Miss. 720 [176 N. Y. Supp. 402]. It is not at all in point. The facts of that case were as follows: A decedent left a will in which he created a trust which covered, among other things, certain securities. Under the statutes of the state of New York some of those securities could not legally be purchased with trust funds, however, the decedent inserted in his will "power to retain all of the property invested as it is now". Without applying to the court for permission the trustee was about to sell the securities for the purpose of complying with the law of the state of New York. There is nothing in the decision showing that the trustee was doing or attempting to do anything excepting to make a conversion of an illegal investment into a legal investment. On page 403 the court said: " . . . it is contended by the plaintiff that it is the duty of the trustee to sell non-legalized securities unless prohibited by the trust instrument, and that mere authority to hold such securities is not a prohibition of the power of sale. I hold the latter rule to be the correct one."

■ The interveners in the next place show that under the terms of the written instruments above mentioned they became remaindermen. As to them they contend it was necessary that the trustee hold the *corpus* intact and that under the facts contained in the record a court of equity had

no power to require that the *corpus* or a part thereof be sold and the proceeds applied as if they were entirely free of the trust. In 4 Bogert in his work entitled "Trusts and Trustees", at page 2367, the author states: "It (a court of equity) will not under any circumstances increase the size of the *cestui's* interest, as where it is asked to order a sale of capital in order to pay part of the proceeds to a life tenant who was given income only." The author cites *Mills* v. *Michigan Trust Co.,* 124 Mich. 244 [82 N. W. 1046], and *Petition of Fero,* 9 How. Prac. (N. Y.) 85. The decisions cited support the text. Other authorities to the same effect are *Thurston* v. *Thurston et al.,* 6 R. I. 296; *Troy* v. *Troy,* 45 N. C. 85, 87; *Standard Oil Co.* v. *Mehrtens,* 96 Fla. 455 [118 So. 216]; *In re Mills,* 28 App. Div. 258 [50 N. Y. Supp. 995]; *In re Stack's Will,* 217 Wis. 94 [258 N. W. 324, 97 A. L. R. 316]. To that contention the trustor makes no direct reply. He is contented to state the rule that where the trustee fails to take steps to protect a trust then a court of equity has power to compel the trustee to take such steps as may be necessary to do so. The trustor cites *Stephens* v. *Howard's Executor,* 32 N. J. Eq. 244. In that case the court held that where a legacy is given *to an infant unconditionally,* so that it vests at once, but is payable when it attains twenty-one, and its father is unable to support it, and the interest arising from the legacy is not sufficient for that purpose, a court of equity may, in advance of the time fixed for payment by the will, order the principal of the legacy applied to the support of the legatee. On facts quite similar the Supreme Court of Tennessee made the same ruling in *Bennett* v. *Nashville Trust Co.,* 127 Tenn. 126 [153 S. W. 840, Ann. Cas. 1914A, 1045, 46 L. R. A. (N. S.) 43]. The trustor also cites and quotes from *Johns* v. *Montgomery,* 265 Ill. 21 [106 N. E. 497, Ann. Cas. 1916A, 996, L. R. A. 1916B, 1073]. That case involved a trust deed executed by William Martin in 1860. The deed conveyed lands immediately adjacent to what was then the village of Decatur in the state of Illinois. Its construction was involved in two different actions. The first one was *Johns* v. *Johns,* 172 Ill. 472 [50 N. E. 337]. This trustor does not cite that case. A complete understanding of the second decision, the case cited by this trustor, involves a short statement of the facts chronologically. In 1860 William Martin

executed the trust deed in favor of Harvey C. Johns, his son-in-law, as trustee. The *corpus* of the trust was an improved farm adjacent to the village of Decatur. The beneficiaries named were Jane M. Johns, the daughter of the trustor, and the heirs of the body of Harvey C. and Jane M. Johns. The deed contained no prohibition regarding sales, neither did it contain any authority to sell. It authorized the trustee to enter, farm, manage, and control the farm; to collect the rents, issues, and profits, to pay all taxes and assessments, to pay himself a reasonable compensation for his performance of his duties under the trust and then to appropriate the balance as follows: (1) to the support and maintenance of Jane M. during her lifetime and (2) to the support, maintenance and education of the children of Harvey C. and Jane M. Johns; (3) residue for improvement of trust estate; but no debt shall be incurred for improving the real estate. The trust was to continue during the life of Jane M. Johns and until her youngest child should attain the age of twenty-one. After the death of Jane M. and after the youngest child attained twenty-one the estate was to be divided among the children. In 1895 Jane M. filed a bill in chancery in which she set forth, among other things, that the real estate was then of a value of $200,000; that the net income during the preceding year was $640; that neither Harvey C. nor any of the other members of the family had any other source of income; that some were in feeble health and were specially in need; and that the home was in need of major repairs which would cost about $3,000. She asked that a part of the land be sold; that the proceeds be invested and that $3,000 be set aside for repairs, certain sums be awarded to herself and to certain of the children for maintenance, support, education, etc. The trial court granted the relief prayed for. On appeal the Supreme Court of Illinois was at pains to point out that the record did not present facts showing that the trust was "created for the purpose of devoting the subject-matter of the trust to the benefit of *infants, or lunatics, or persons under other disability, and only because of such disability*". The court quoted from decisions that if such facts had been shown it could have sustained the decree. But, on page 342 the court said: "But those cases are not to be understood as authority for the proposition that the court, in the case of a trust such as appears at bar, is justified in breaking in upon the trust, and disposing of the

subject-matter, against the will of the donor, on the ground that the immediate beneficiaries will receive greater benefit by reason of the proposed change in the trust than would accrue to them if the trust is administered according to the will of the donor. . . . The mere fact that a sale of the land might benefit the beneficiaries more than the compliance with the terms of the trust does not furnish a reason for a decree ordering the title of the land to be disposed of in opposition to the manifest wish of the donor. The duty of the court in dealing with such a trust is to observe and carry out the purpose and plans of the donor, unless the preservation of the subject-matter of the trust, or some other like necessity, demands interference with his will and intention. The evidence does not disclose a condition of such urgency or necessity. The decree is grounded solely upon the interest and convenience of the immediate beneficiaries. This is not enough to justify a decree nullifying the expressed wish and purpose of the creator of such a trust as the one under consideration. The decree is reversed, and the cause remanded.'' That decision is a clear statement to the effect that the mere needs of Arthur Zellerbach and Dorothy Johnson Zellerbach did not authorize the trial court, in the instant case, to break in upon the trust as it was written.

At a date somewhat prior to 1914 there had been important changes in the facts involving the above-mentioned Martin trust. Harvey C. Johns, as trustee, had been replaced by Robert R. Montgomery. The village of Decatur had grown into a large city. Many houses had been constructed near the land included in the trust. Another bill was filed based on new facts. Another decree was entered against the trustee. It was reviewed in the case entitled *Johns* v. *Montgomery, supra.* In 106 N. E. 498 the Supreme Court of Illinois states the facts as follows: ''The tract of land involved in this trust at the time the deed was made was in the suburbs of the city of Decatur. At that time the best use to which it could be put was for agricultural purposes. It appears from the bill, the evidence, and findings of the court that the city of Decatur has extended its boundaries and increased in population so that at present the land in question is almost, if not totally, surrounded by the inhabited portion of the city of Decatur and is now within the city limits. It is shown that there are 637 houses and 2,498 inhabitants living within two blocks of said premises,

and that as a result its usefulness as a farm has decreased, while its general value has materially advanced. It also appears that in its present situation the only use to which the premises can be put is for pasturage, and that the income therefrom for such purpose is wholly insufficient to defray the taxes and other necessary expenses of maintaining the premises. It also appears that the city authorities are contemplating proceedings for special street and sidewalk improvements, and for a large sewer which will pass entirely through the tract, and other local improvements are under contemplation which will have to be paid for by special assessment or special taxation, and from the evidence it is shown that the special taxes levied upon the trust property for these various local improvements will be from $100,000 to $140,000, and that there is no source of income from which these burdens can be paid under the existing terms of the trust, and that if the trust deed is not modified the result will be the complete destruction of the trust estate and its total loss to the beneficiaries." As to the law applicable the court says: "In regard to the jurisdiction of courts of chancery to direct the conversion of real estate into personal property, and *vice versa,* and to decree other modifications of trust agreements when it becomes necessary to preserve the trust estate, it may be stated as a general proposition that, while the power is exercised with great caution, it has become a well-established rule that, when the courts can see that unforeseen conditions have arisen which make it necessary, to preserve the rights of beneficiaries under trust instruments, to change the terms of the trust, courts of equity have not hesitated to direct such necessary modifications as will preserve the trust estate for the use of the beneficiaries. . . . The facts here present the alternative of modifying the trust agreement or else losing the entire trust estate. Had the donor of this trust foreseen the exigencies that have arisen since the trust deed was made, a due regard for the interest of his beneficiaries would have compelled him to make a provision for the sale of a portion of this estate in order to preserve the whole. Apparently the only means left open to the beneficiaries under this trust is to appeal to a court of equity to preserve their estate by permitting a subdivision and sale of the premises, or, in other words, to authorize a conversion of real estate into personal property. In our opinion the facts present a case calling for

the interposition of a court of equity in order to preserve a trust estate which would otherwise ultimately be lost to its owners." But in the case at bar there was not a particle of evidence to the effect that the corporate stocks were to be lost to the trust estate, nor was there any showing to the effect that the corporate entity which issued the securities was insolvent or threatened with insolvency.

It follows that the judgment appealed from should be reversed and it is so ordered.

Nourse, P. J., and Spence, J., concurred.